**REVERSE and REMAND; and Opinion Filed August 28, 2013.**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-12-00429-CV**

**DAWN CURTIS, Appellant**
**V.**
**AGF SPRING CREEK/COIT II, LTD., Appellee**

**On Appeal from the 14th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-10-04499-A**

## OPINION

Before Justice Bridges[1], Justice Evans, and Justice Richter[2]
Opinion by Justice Richter

This is a dispute between a landlord and a tenant for breach of a lease of commercial premises. The case was tried before a jury. Based on the jury's verdict, the trial court entered a judgment for appellee AGF Spring Creek/Coit II, Ltd., the landlord. Because there was some evidence to support an award of damages, but no evidence that the amount of damages found by the jury was caused by the tenant's breach, we reverse the trial court's judgment and remand the cause for new trial.

---

[1] Chief Justice Carolyn Wright was on the panel and participated in the submission of this case, but did not participate in the issuance of this Opinion. Justice David Bridges has read the briefs and reviewed the record and now serves as a member of the panel.

[2] The Hon. Martin Richter, Justice, Assigned

BACKGROUND

In June, 2004, AGF Spring Creek/Coit II, Ltd. (Landlord) and Atrium Executive Business Centers Richardson, LLC (Atrium) as tenant entered into a written lease agreement for office space in Richardson, Texas. The lease term was to commence on November 1, 2004, and continue for a period of 72 months. Appellant Curtis signed the lease as President of Atrium. The parties subsequently signed three written agreements to modify the lease. The first modification, dated January 29, 2005, amended a provision of the lease regarding parking at the premises. The second modification, signed in August, 2007, and the third modification, dated September 23, 2009, amended the lease provisions regarding the payment of rent. The third modification also extended the term of the lease until February 28, 2015. Like the lease, each modification was signed by Curtis as President or CEO of Atrium.

Atrium, however, was never formed. Instead, Curtis formed a corporation named AEBC-Richardson, Inc. (AEBC). There is no dispute that an entity of which Curtis was a principal occupied the leased premises and operated a business there between 2004 and March 2010. The evidence showed that the tenant operated executive suites on the premises, providing shared office space, conference rooms, receptionists, and services such as telephone, fax, and internet to its small business clients. There is also no dispute that Atrium, not AEBC, was shown as the tenant on the lease and on all subsequent modifications to the lease, or that Curtis signed each document as President or CEO of Atrium, not AEBC.

On Saturday evening, March 13, 2010, Curtis sent an e-mail to representatives of Landlord stating that "we can no longer support our Richardson location," and that "[d]ue to the fact that our revenues are still too low we are forced to return the keys to you." Curtis stated that "[o]ur clients do not know that we are leaving this location," and requested Landlord to "please have someone on-site by 8:00 a.m. Monday morning so that they are informed." The e-mail

–2–

gave additional details about the voicemail system, the master keys, and other information relevant to the Landlord's taking over the operation of the business immediately. No rent was paid after the tenant moved out. Landlord terminated the lease by written notice dated March 23, 2010.

On April 15, 2010, Landlord brought suit against Curtis individually for breach of the lease. Landlord alleged that although Atrium was named as the tenant on the lease, Atrium "never existed," and Curtis was individually liable. The case was tried to a jury. In response to a single question, the jury found that the amount of $200,000 "would fairly and reasonably compensate" Landlord for damages resulting from the breach of the lease. The trial court entered judgment against Curtis individually on the jury's verdict. This appeal followed.

ISSUES

Curtis raises four issues on appeal. Her first three issues arise from her complaint that the trial court's judgment was against her individually rather than against AEBC. In particular, she contends that the trial court erred by refusing her requested special issue to allow the jury to determine whether there was a lease by conduct between Landlord and AEBC. In her fourth issue, Curtis challenges the legal and factual sufficiency of the evidence to support the jury's finding of damages.

STANDARDS OF REVIEW

We review a trial court's submission of jury questions for an abuse of discretion. *Dallas City Limits Prop. Co., L.P. v. Austin Jockey Club, Ltd.*, 376 S.W.3d 792, 801 (Tex. App.—Dallas 2012, pet. denied). The trial court's failure to submit a jury question that is not "in substantially correct wording" is not reversible error. TEX. R. CIV. P. 278; *Dick's Last Resort of West End, Inc. v. Market/Ross, Ltd.*, 273 S.W.3d 905, 914 (Tex. App.—Dallas 2008, pet. denied).

–3–

Rule 277 of the Texas Rules of Civil Procedure requires the trial court to "submit such instructions and definitions as shall be proper to enable the jury to render a verdict." TEX. R. CIV. P. 277. We do not disturb the trial court's decision on which instructions to submit to the jury absent an abuse of discretion. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006); *Latham v. Burgher*, 320 S.W.3d 602, 607 (Tex. App.—Dallas 2010, no pet.). A trial court has more discretion when submitting instructions than when submitting questions. *Wal-Mart Stores, Inc. v. Middleton*, 982 S.W.2d 468, 470 (Tex. App.—San Antonio 1998, pet. denied). When a trial court refuses to submit a requested instruction, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict. *Shupe*, 192 S.W.3d at 579. The omission of an instruction is reversible error only if the omission probably caused the rendition of an improper judgment. *Id.*; *see* TEX. R. APP. P. 44.1(a). The trial court's refusal to submit a requested definition or instruction is not reversible error unless a substantially correct definition or instruction has been requested in writing by the party complaining of the judgment. TEX. R. CIV. P. 278.

Curtis also challenges the legal and factual sufficiency of the evidence to support the jury's finding of damages caused by breach of the lease. In reviewing the legal sufficiency of the evidence, we consider all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *See Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 286 (Tex. 1998). We must credit the favorable evidence if reasonable jurors could and disregard the contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). When reviewing a finding for factual sufficiency, we consider all of the evidence and will set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). When reversing a judgment on

insufficiency of the evidence, we must "detail the evidence relevant to the issue in consideration and clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust . . . ." *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

DISCUSSION

### 1. Individual liability of Curtis

We consider Curtis's first and third issues together.[3] Through her arguments that she should not be held liable individually on the lease, Curtis requests equitable relief. She acknowledges her "mistake" in failing to change the name of the tenant on the lease, and in signing the modification agreements as president of a company that did not exist. She contends, however, that this mistake is not "serious enough . . . to justify the imposition of personal liability on the person that signed the lease as president of the entity to be formed." She also contends that the trial court should have allowed the jury to consider whether a lease was formed between Landlord and AEBC by conduct of the parties.

Curtis requested that the following question and instruction be submitted to the jury:

> Do you find that a lease was created between the Plaintiff and AEBC-Richardson, Inc. for the premises which are the subject matter of this suit?
>
> Answer "Yes" or "No"
>
> A lease may be implied from the acts of parties. It may be created by words or other conduct that indicates consent to the lessee's possession, and conduct expressing consent may consist of the mere failure to object to the presence of a tenant that may have originally entered the premises without the consent of the landlord.

---

[3] Landlord argues, and we agree, that Curtis failed to present any argument or authority on her second issue, "whether the guaranty contained in the original lease was a sufficient agreement by the landlord to limit Curtis's individual liability to the rent accruing during the first 26 months of the lease term." Rule 38.1(i), Texas Rules of Appellate Procedure, requires that an appellant's brief include "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). Failure to cite applicable authority or provide substantive analysis waives an issue on appeal. *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.). Therefore, nothing is presented for our review on this issue. *Id.*

In support of her argument that a lease between Landlord and AEBC was created by the conduct of the parties, Curtis relies on three cases: *Odessa Texas Sheriff's Posse, Inc. v. Ector County*, 215 S.W.3d 458 (Tex. App.—Eastland 2006, pet. denied), *Capitol Rod & Gun Club v. Lower Colorado River Authority*, 622 S.W.2d 887 (Tex. App.—Austin 1981, writ ref'd n.r.e.), and *City of Fort Worth v. Barlow*, 313 S.W.2d 906 (Tex. Civ. App.—Fort Worth 1958, writ ref'd n.r.e.). Only in *Barlow* did the court apply an equitable doctrine to construe a written lease to include additional terms.[4] *Barlow* includes language similar to Curtis's requested instruction:

> A lease may be created by words or other conduct expressing consent to the lessee's possession. The conduct expressing consent may consist merely in a failure to object to the presence of one who has entered without the lessor's consent but not adversely to him. American Law Institute, Restatement of the Law of Torts, Vol. II, p. 966, sec. 355.

*Barlow*, 313 S.W.2d at 915. This language is taken from a comment to section 355 of the first Restatement of Torts. *See* RESTATEMENT (FIRST) OF TORTS, §355 cmt. a (1934); *see also City of Tyler v. Ingram*, 139 Tex. 600, 606–07, 164 S.W.2d 516, 520 (1942) (quoting section 355 and comment a). Section 355 addressed a lessor's tort liability for a "dangerous condition which comes into existence after the lessee has taken possession," and provided that the lessor is "not subject to liability for bodily harm caused to his lessee." *Id.* In both *Barlow* and *City of Tyler*, the ultimate issue was tort liability to an injured third party. *See Barlow*, 313 S.W.2d at 908 (plaintiff seriously injured when diving in swimming facilities at Lake Worth); *City of Tyler*, 164 S.W.2d 518 (plaintiff injured when temporary bleachers erected in public park fell).

*Barlow* is also distinguishable on its facts. In that case, an issue arose regarding whether the area where the plaintiff was injured was included in the lease's property description. *Barlow*,

---

[4] In both *Odessa Texas Sheriff's Posse, Inc.*, and *Capitol Rod & Gun Club*, a unit of government was the owner of the real property in question. *See Capitol Rod & Gun Club*, 622 S.W.2d at 889 (Lower Colorado River Authority claimed ownership of the property); *Odessa Texas Sheriff's Posse, Inc.*, (lease of real property from Ector County). In both cases, the courts followed the rule that "a governmental entity cannot be divested of property rights by estoppel." *See Odessa Texas Sheriff's Posse, Inc.*, 215 S.W.3d at 466 (citing *Capitol Rod & Gun Club*, 622 S.W.2d at 887). Thus, neither case is instructive here.

313 S.W.2d at 913–15. Lake Worth Beach Company, the tenant, argued that its lease from the City of Fort Worth did not include the bed and waters of the lake. *Id.* at 914. The court construed the lease to include the swimming area where the plaintiff was injured. *Id.* at 915. Citing the lease's numerous references to a swimming center to be operated by the Beach Company, the court explained that the parties "surely intended that Beach Company would use so much of the waters of the lake as reasonably necessary to carry out such obligations." *Id*. The court noted that without this construction, the lease would be "to a large extent, meaningless," because an important "object of the very lease—to develop an outstanding swimming center—could not be accomplished." *Id*. The court explained that "[a] lease may be created by words or other conduct expressing consent to the lessee's possession." *Id.* The court emphasized that the parties had "treated the lease for more than seven years as creating a landlord and tenant relationship as to the swimming area." *Id.* The lease specified "that the lessee was to do certain things in the lake, which would necessarily carry with it possession," and the city agreed both in the lease and by conduct that it would not interfere with the lessee's possession. *Id.*

Here, Curtis points to evidence developed at trial that reimbursement of the tenant's move-in expenses, as well as the tenant's rent payments, fax transmissions, insurance policy, sales and use tax permit, and service agreements with its clients were all made in the name of AEBC rather than Atrium, and that Landlord was aware of these documents. But in contrast to *Barlow*, the object of the lease—to provide commercial premises in which the tenant could conduct its executive suite business—could be accomplished without applying the lease by conduct doctrine to substitute AEBC as the tenant. *See id.* The lease expressly identified the tenant as Atrium. The lease also provided that it "shall not be altered, waived, amended or extended, except by a written agreement signed by the parties hereto . . . ." The parties signed

–7–

three subsequent modifications to the lease identifying Atrium as the tenant. Instead of conforming the terms of the lease to the parties' original intent as in *Barlow*,[5] application of the lease by conduct doctrine would alter a material term of the contract, the identity of one of the contracting parties.[6]

Landlord also argues that our opinion in *Kahn v. Imperial Airport, L.P.*, 308 S.W.3d 432, 438 (Tex. App.—Dallas 2010, no pet.), "is right on point and very parallel." *Kahn* was also a suit for breach of a commercial lease against an individual. *See id.* at 435. Kahn signed the lease as president of an entity that did not exist. *Id.* at 438–39. Kahn argued that he signed the lease as a promoter for a later-created entity, and therefore was not individually liable under the lease. *Id.* We disagreed, explaining that "when a promoter signs a contract on behalf of an unformed entity, he is personally liable on the contract unless there is an agreement with the contracting party that the promoter is not liable." *Id.* As in *Kahn*, our record contains no evidence that Landlord agreed not to hold Curtis liable. *See id.*

Curtis argues that *Kahn* "also stands for the proposition that an entity unformed at the time a lease is made can adopt the lease after the entity is formed." *See id.*; *see also Fish v. Tandy Corp.*, 948 S.W.2d 886, 898 (Tex. App.—Fort Worth 1997, writ denied) ("a promoter is relieved of personal liability only when the corporation subsequently adopts the contract either expressly or by accepting its benefits"). But here, the entity was never formed, and thus could not "subsequently adopt" the lease. Curtis argues that the only difference between the unformed entity and the corporation she did form was the name. If Landlord had sought to recover for breach of the lease against AEBC, however, AEBC could defend the suit on the ground that it

---

    [5] *See Odessa Texas Sheriff's Posse, Inc.*, 215 S.W.3d at 465-66 (explaining that "[t]he effect of the [*Barlow*] court's decision was to conform the lease's property description to the parties' original intent").

    [6] *See, e.g., Dobson v. Metro Label Corp.*, 786 S.W.2d 63, 65 (Tex. App.—Dallas 1990, no writ) (citing *Cohen v. McCutchin*, 565 S.W.2d 230, 232 (Tex. 1978) (to satisfy statute of frauds, written memorandum must contain "all the elements of a valid contract, including an identification of both the subject matter of the contract and the parties to the contract").

was not a party to the lease, and could not become a party without the written modification required by the lease. We conclude that Curtis's requested jury issue and instruction were not "reasonably necessary to enable the jury to render a proper verdict." *Shupe*, 192 S.W.3d at 579. The trial court did not abuse its discretion by refusing to submit the issue and instruction to the jury. *See id.* We overrule Curtis's first three issues.

### 2. Sufficiency of evidence of damages

In her fourth issue, Curtis argues that there is no evidence to support the jury's award of damages. The sole question submitted to the jury inquired about damages:

> QUESTION NO. 1
> What sum of money, if any, now paid in cash would fairly and reasonably compensate AGF Spring Creek Coit II, Ltd. for its damages, if any, that resulted from the breach of the subject lease between AGF Spring Creek Coit II, Ltd. and Atrium Executive Business Centers Richardson, L.L.C., commencing November 1, 2004.
>
> Do not add any amount for interest on damages, if any. Answer in dollars and cents for damages, if any.
>
> ANSWER: $200,000

Curtis contends that the only evidence offered by Landlord of the expenses it incurred after the tenant vacated the premises was a business records affidavit attaching a list of expenditures made after the termination of the lease. Curtis argues that Landlord failed to make any showing that the expenditures were made necessary by the tenant's termination or that the expenditures were reasonable. She argues that "[t]he absence of a causal connection between the alleged breach and the damages sought will preclude recovery," citing *Prudential Securities, Inc. v. Haugland*, 973 S.W.2d 394, 397 (Tex. App.—El Paso 1998, pet. denied).

To prevail in an action for breach of lease, the lessor must prove (1) that a valid contract existed between the lessor and lessee; (2) that the lessor had a right under the contract to receive rental payments from the lessee; (3) that the lessee breached the contract; and (4) that because of

that breach the lessor suffered damages.  *Harry Hines Med. Ctr., Ltd. v. Wilson*, 656 S.W.2d 598, 601 (Tex. App.—Dallas 1983, no writ) (per curiam).

Frederick G. Currey, a representative of Landlord, testified about Landlord's efforts to mitigate damages after the tenant vacated the premises.[7]  He described what steps he and others took after receiving Curtis's e-mail notice that the tenant was vacating the premises.  He described setting up the telephone system and other measures taken.  He did not, however, testify as to the cost of these measures, or the actual amount of rent due as a result of the tenant's breach.  He stated:

> Q:  Why did AGF decide to keep these executive suites open?
>
> A:  To cut our losses and mitigate damages which we're required to do by law.
>
> . . .
>
> Q.  And you succeeded in doing that, did you not?
>
> A.  Yes, sir.
>
> Q.  And you heard Ms. Curtis testify as to the reduction of the claim – in the losses of AGF due to what you did in the last year and a half, –
>
> A.  Yes, sir.
>
> Q.  – eight months.

Leora Lesh, also a representative of Landlord, gave testimony similar to Currey's.  She testified about actions she and others took after the tenant vacated the premises.  She testified that Landlord operated the premises for a year and a half after the tenant moved out.  She testified that it was important to keep operating the premises for the subtenants rather than

---

[7] We note that it is the tenant's burden, not the landlord's, to demonstrate that the landlord has failed to mitigate damages and the amount by which the landlord could have reduced his damages.  *See White v. Harrison*, 390 S.W.3d 666, 675 (Tex. App.—Dallas 2012, no pet.) (citing *Austin Hill Country Realty, Inc. v. Palisades Plaza, Inc.*, 948 S.W.2d 293, 299 (Tex. 1997), and TEX. PROP. CODE § 91.006(a)).  That is not the issue presented here.  Curtis does not complain about Landlord's evidence of mitigation; instead, she complains about the lack of evidence of causation between the total amount of damages awarded by the jury and the tenant's breach of the lease.

–10–

closing down the tenant's business. She explained that Landlord "absolutely made the best

decision" to continue operations, because

> Well, first, it's the right thing to do. I mean, I wasn't about to
> leave all of these tenants who have families and businesses out in
> the dark; and, second, I believe it is our legal obligation to mitigate
> to the best of our ability; and third, you know, even though it was a
> lot of money, blood, sweat, tears, aggravation and everything else,
> you know, we did what we have to do, this is the business we're in.

Neither Lesh nor Currey testified about any amounts due under the lease, or any amounts

due as a result of the tenant's breach of the lease. Neither witness testified about specific

amounts of expenses incurred by Landlord in its continued operation of the premises. The

landlord did not call any other person to testify except Curtis as an adverse witness.

Plaintiff's Exhibits 8 and 9 were business records affidavits filed prior to trial by

Landlord. *See* TEX. R. EVID. 902(10) (providing for self-authentication of business records

accompanied by affidavit). In addition to the lease, guaranty, and modifications, these exhibits

included a summary sheet showing figures for "outstanding charges" under the lease, "recovered

income from executive suite sub-tenants," and "expenses for executive suites." Exhibit 9 shows

a "loss on executive suites" of $514,988.96, the amount Landlord's attorney in closing argument

requested that the jury award as damages. But no witness testified about the amounts due either

in rent or for expenses. No witness testified that the specific expenses shown on exhibits 8 and

9, such as amounts for "legal fees," "professional architect," "other expenses, management" and

other categories shown, were incurred as a result of the tenant's breach of the lease. And no

witness testified that the expenses were reasonable and necessary.[8]

The only other witness called by Landlord was Curtis. She admitted that she signed the

lease and modifications on behalf of Atrium. She admitted that Atrium was never created and

---

[8] *See, e.g., Mustang Pipeline Co. v. Driver Pipeline Co., Inc*, 134 S.W.3d 195, 200–01 (Tex. 2004) (per curiam) (evidence of amounts charged and paid, standing alone, is no evidence that such payment was reasonable and necessary).

–11–

did not exist. She admitted that the lease required the tenant to notify Landlord in writing to change the tenant from Atrium to AEBC, and that she never did so. She admitted that the lease could be modified only in writing. She explained that the lease called for increased amounts of rent over time, in order to allow time to find tenants to sublease the space. She admitted that she requested two of the modifications of the lease to defer some of the rent "because we weren't able to pay full rent." She admitted that the tenant moved out in March 2010, and that the last rent payment made by the tenant was for February 2010.

Curtis was the only witness who was asked about plaintiff's exhibits 8 and 9. She looked at the summary sheet on exhibit 9, and was asked to read the totals for "outstanding charges" and "loss on executive suites." She was then asked:

> Q. Okay. So the landlord mitigated your losses by over $120,000, or right at 120,000. It goes from 634,974 down to 514,988. So the landlord reduced your losses by running these – this suite by $120,000; is that correct?
>
> A. That's what it says.

Curtis did not testify that the numbers for rent due, losses, or expenses were accurate or inaccurate. She was not asked about any of the other information or amounts included in exhibits 8 and 9.

The jury found the amount of $200,000 in damages "would fairly and reasonably compensate" Landlord for its damages "that resulted from the breach of the subject lease." There is nothing in the record to support this amount of damages, or to support a finding that this amount of damages was caused by the tenant's breach. But there is some evidence to support an award of damages. There is undisputed evidence that the tenant vacated the premises before the end of the lease term in breach of the lease, and that Landlord took over the operation of the tenant's business for some period of time after the tenant moved out and incurred expense in doing so.

–12–

We will not disregard a jury's damage award merely because its reasoning in reaching its figures is unclear. *See Enright v. Goodman Distribution, Inc.*, 330 S.W.3d 392, 403 (Tex. App.—Houston [14th Dist.] 2010, no pet.). A jury may award damages within the range permitted by the evidence, as long as a rational basis exists for the jury's damage calculation. *Id.* But a jury may not arbitrarily assess an amount not authorized or supported by evidence at trial. *Id.* We conclude that the evidence was legally and factually insufficient to support the jury's finding that $200,000 in damages was caused by the tenant's breach of the lease. We sustain Curtis's fourth issue.

CONCLUSION

Because the evidence is legally insufficient to support a finding that the tenant's breach caused the amount of damages awarded by the jury, we reverse the trial court's judgment. *See Guevara v. Ferrer*, 247 S.W.3d 662, 670 (Tex. 2007) (judgment reversed when evidence of causation legally insufficient). Generally we render judgment when a no evidence issue is sustained following a trial on the merits. *Id.* But when there is evidence to support some damages it is not appropriate to render judgment. *Id.* (citing *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314–15 (Tex. 2006), and *Minn. Mining & Mfg. Co. v. Nishika, Ltd.*, 953 S.W.2d 733, 740 (Tex. 1997)). And when liability is contested, we are required to remand the entire proceeding for a new trial on both liability and damages. *See* TEX. R. APP. P. 44.1(b) (prohibiting separate trial solely on unliquidated damages when liability is contested); *Qui Phuoc Ho v. MacArthur Ranch, LLC*, 395 S.W.3d 325, 335 (Tex. App.—Dallas 2013, no pet.). We therefore reverse the trial court's judgment and remand for new trial.

/Martin Richter/
MARTIN RICHTER
JUSTICE, ASSIGNED



## Court of Appeals
## Fifth District of Texas at Dallas
# JUDGMENT

DAWN CURTIS, Appellant

No. 05-12-00429-CV V.

AGF SPRING CREEK/COIT II, LTD, Appellee

On Appeal from the 14th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DC-10-04499-A.
Opinion delivered by Justice Richter, Justice Bridges and Justice Evans participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and the cause is **REMANDED** for new trial.

It is **ORDERED** that appellant Dawn Curtis recover her costs of this appeal from appellee AGF Spring Creek/Coit II, Ltd.

Judgment entered this 28th day of August, 2013.

/Martin Richter/

MARTIN RICHTER
JUSTICE, ASSIGNED